# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SHAWN K. ODNEAL,

               Plaintiff,

v.

PAUL SCHNELL, GUY BOSCH,
MARRISA WILLIAMS, STEPHANIE
HUPPERT, JENNY CARUFEL, ERIC
HENNEN, LEIGH MCCOY, CELEST
AILERU,

               Defendants.

Case No. 22-CV-03107 (JRT/JFD)

**REPORT AND RECOMMENDATION**
and
**ORDER**

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 42) and Motion for an Order to Compel Discovery (Dkt. No. 54). The parties have filed cross-motions for summary judgment. (Dkt. Nos. 60, 63.) The case was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The Court considered the parties' written arguments and now submits this Report and Recommendation. Mr. Odneal claims the definitions of "nudity" and "sexually explicit" in the contraband policy of the Minnesota Department of Corrections (MN DOC) violate his First Amendment and Due Process rights. (Compl. ¶¶ 13, 19, 23, 33, Dkt. No. 1; Pl.'s Mem. of L. Supp. Mot. Prelim. Inj. ("Pl's Mem. Supp. Inj.") 2, Dkt. No. 45.) The undersigned recommends denying the Motion for a Preliminary injunction and denies Mr. Odneal's Motion to Compel.

1

## I.    BACKGROUND

This lawsuit concerns state prisoners' access to sexually suggestive photos. MN DOC policy allows inmates to receive photos through paper mail and as attachments to email but prohibits inmates from receiving photos containing nudity or other sexually explicit content. (Declaration of Mary McComb ("McComb Decl.") ¶ 3, Ex. 1, Dkt. No. 50-1, DOC Policy 302.020 (regarding mail); *id.* Ex. 2, Dkt. No. 50-1, DOC Policy 301.030 (regarding contraband).) The contraband policy—Policy 301.030—prohibits

> Published or unpublished sexually explicit materials that contain depictions or written descriptions of prohibited content including such as . . . (1) Nudity, (2) Direct physical stimulation of unclothed genitals, (3) Masturbation, (4) Sexual intercourse (including vaginal, oral, anal, or bestiality), (5) Bodily fluids, (6) Flagellation or torture in a sexual context, and (7) Sex-related materials determined to constitute a risk to the safety and security of the facility, facilitate criminal activity, or undermine offender/resident rehabilitation.

(McComb Decl. ¶ 3, Ex. 2 at 15–16. [1]) The policy defines nudity as

> [T]he depiction of human male or female genitals, anus, or pubic area or of the female breast or a substantial portion of the breast below the top of the nipple, with or without see-through covering, such as "pasties," lace, mesh, and body paint through which the covered area is showing; coverings emphasizing the depiction of human genitals; or tight-fitting clothing through which the contours of the genitals are clearly visible.

(*Id.* at 14.)

Each DOC facility receives hundreds of nude photos through the mail per week, and the policy's definition of nudity is designed to be applied "consistently and quickly" so that staff can process the large volume of mail the prisons receive daily. (McComb Decl. ¶ 11.)

---

[1] All references to page numbers are to the pagination assigned by the CM/ECF filing system.

DOC staff review all incoming mail to determine whether it contains contraband. (McComb Decl. ¶ 4.) If contraband is found, the mail is not delivered to the prisoner; instead, the prisoner receives a notice of non-delivery that explains why the mail was rejected. (*Id.* ¶ 3, Ex. 1 at 7–8.) If a prisoner wishes to challenge a determination that a piece of mail contains contraband, they can appeal it to the mailroom supervisor, then to the Correspondence Review Authority, which is a group of individuals who are all senior to the mailroom supervisor and mailroom staff. (McComb Decl. ¶ 4.)

Prisoners can also receive photographs through email hosted on kiosks in the prison. (McComb. Decl. ¶¶ 12.) The contraband policies apply equally to email mail as they do to postal mail, and attachments to emails are screened by mailroom staff. (*Id.* ¶ 13.) If a picture attached to an email violates the contraband policy, it is not delivered. (*Id.*) Staff reviewing the picture enter the reason for the non-delivery in the kiosk service provider software, and the sender of the message is notified of the rejection and the basis for it. (*Id.*) Prisoners are not notified of the non-delivery and they cannot appeal the rejection of an email. (*Id.*) The sender, who does receive a notice of non-delivery, may send the same content through the physical mail, and when the mailroom issues a notice of non-delivery to the prisoner, the prisoner can appeal that denial. (*Id.*) The MN DOC's rationale for not having a direct appeal process for rejected emails is the sheer number of photographs that are sent via email every month, which can exceed 50,000. (*Id.*) According to DOC officials, it is "simply not feasible for DOC staff to print and retain rejected photographs" so that prisoners can appeal the rejection of email in the same way that they can appeal the rejection of postal mail. (*Id.*)

3

Mr. Odneal is confined to the Stillwater facility of the Minnesota Department of Corrections (MCF-Stillwater). (Compl. ¶ 3; McComb Decl. ¶ 5.) He is serving a life sentence for two counts of First Degree Aggravated Sexual Assault on a Child and is in Minnesota pursuant to the Interstate Compact for Adult Offenders. (Defs.' Mem. Opp'n Mot. Prelim. Inj. 1–2; Declaration of Sarah Knoph ¶¶ 2–3, Exs. 1–2, Dkt. No. 49-1.) During the years he has been incarcerated in Minnesota, Mr. Odneal claims to have purchased hundreds, if not thousands, of "non-nude" photographs from vendors that sell sexual images to prisoners. (Compl. ¶ 13; McComb Decl. ¶ 11.) The MN DOC has refused to deliver certain photos Mr. Odneal purchased and had sent to him via postal mail and through his prison email because they were considered contraband. (Declaration of Shawn K. Odneal ("Odneal Decl.") 1–2, Ex. 1 at 6, Dkt. No. 42 (reprinting notice of non-delivery); Compl. ¶¶ 30–31 (regarding email).) When he attempted to appeal the non-delivery of the emailed photos, the DOC informed him that decisions about email attachments could not be appealed, and that if he wanted to appeal the decision, the sender needed to resend the images through the postal mail. (Compl. ¶¶ 31–32.) If the mailroom rejected the images, Mr. Odneal could then appeal the contraband designation using the established process for postal mail. (*Id.*)

Mr. Odneal argues that the MN DOC's "vague" definition of nudity "is being used to intentionally restrict" expressive activity under the First Amendment. (Compl. ¶ 19.) Specifically, he says the policy counterintuitively categorizes pictures in which people are "wearing coverings emphasizing the depiction of human genitals" or "tight fitting clothing through which the genitals are clearly visible" as nude pictures when, by definition, all

4

their genitals are covered. (*Id.*) He argues that the DOC's non-delivery of email attachments "without notice, reason, or appeal process" violates his First Amendment right to freedom of expression and his right to due process. (Compl. ¶¶ 33–34, 46–47.) Defendants are the Commissioner of MN DOC, the warden of MCF-Stillwater, and other MCF-Stillwater staff. (Compl. ¶¶ 4–11.) Mr. Odneal seeks declaratory relief, injunctive relief, compensatory damages, and punitive damages. (Compl. ¶¶ 1, 49–52.)

After filing his initial complaint under 42 U.S.C. § 1983, Mr. Odneal continued to purchase digital pictures, catalogues, and videos, spending more than $100 in total. (Odneal Decl. 2; Pl.'s Mem. Supp. Prelim. Inj. 3, Dkt. No. 45.) Some of these pictures made it through screening and some did not. (Odneal Decl. 1–2.) According to him, he was allowed to possess catalogs advertising pictures of models but when he tried to order the images in those catalogues, the images were considered contraband and not delivered[2]. (*Id.*) Mr. Odneal was discouraged by these developments and took the additional step of filing a motion for a preliminary injunction to (1) prohibit MN DOC from using its definitions of "nudity" and "sexually explicit" in reviewing his mail, (2) require it to apply a "contemporary community standard" in defining those terms as they relate to his mail, and (3) prohibit the named defendants from having any role in inspecting his property for

---

[2] While he does not make this argument in his memorandum of law, the exhibits to his motion suggest that Mr. Odneal believes that MN DOC officials are denying him materials in retaliation for filing this lawsuit. (Odneal Decl., Ex. 1 at 3, 7–9, Dkt. No. 45-1.)

contraband or participating in any appeals of contraband determinations he may file. (*Id.*; *see* [Proposed] Order to Show Cause for a Preliminary Injunction 1–2, Dkt. No. 44.)[3]

About two months after filing his motion for a preliminary injunction, Mr. Odneal filed a Motion for an Order to Compel Discovery. (Dkt. No. 54.) Mr. Odneal asks the Court to compel the MN DOC to respond to his Interrogatory Number 4, which asks if the defendants "follow any religious practices or faiths" and requires them to disclose the name of their "religion or spiritual belief" and how often they attend its gatherings. (*See, e.g.*, Declaration of Corinne Wright ("Wright Decl.") Ex. 1 at 2, Dkt. No. 58-1.) Defendants objected to the request on relevance grounds, saying "any particular Defendant's religious affiliation has no bearing on DOC policies or the enforcement of those policies," and refused to answer. (Wright Decl. Ex. 2 at 20, Dkt. No. 58-1.) The Court addresses each motion in turn.

## II.    THE MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED BECAUSE MR. ODNEAL FAILS TO MEET HIS BURDEN UNDER THE *DATAPHASE* TEST.

Mr. Odneal brought a motion for a preliminary injunction because prison officials continue to classify some of his mail as contraband because it contains "nudity" or "sexually explicit" content under MN DOC rules. (Pl.'s Mem. Supp. Inj. 2.) He claims this erroneous categorization has caused him to lose money and property and has chilled his freedom of expression. (*Id.* at 2–3.) He believes injunctive relief is necessary because the violations are causing him irreparable harm, and an injunction that vindicates his rights

---

[3] Mr. Odneal also filed a Motion for Summary Judgment (Dkt. Nos. 31), which was denied (Dkt. Nos. 39, 47).

will only "slightly inconvenience[]" the MN DOC. (*Id.* at 3.) Defendants reply that Mr. Odneal has failed to show he is entitled to a preliminary injunction. (Defs.' Mem. Opp'n Mot. Prelim. Inj. ("Defs.' Mem. Opp'n Prelim Inj.") 8.) Defendants are right.

### A. Legal Standard

Courts issue preliminary injunctions when "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo" until it can resolve the dispute on the merits. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); Fed. R. Civ. P. 65(a). The purpose of a preliminary injunction is not to address past harms or decide the issue on the merits, but to protect parties from irreparable injury. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017); *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1015 n.3 (8th Cir. 2021). A preliminary injunction is "an extraordinary remedy" and the movant bears the burden of showing that the equities require it. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023). Courts in the Eighth Circuit apply a four-factor test to determine whether a preliminary injunction is warranted:

> Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase*, 640 F.2d at 113. While no factor is determinative, the probability of success on the merits is the most important. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022).

"[I]n the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982)). While litigants representing themselves, like Mr. Odneal, must comply with the rules of court, *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005), courts construe their filings liberally so that meritorious claims are not "lost through inadvertence or misunderstanding." *Williams v. Carter,* 10 F.3d 563, 567 (8th Cir.1993) (citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

### B. Analysis

The Court finds that the equities in this case do not favor a preliminary injunction. An analysis of the *Dataphase* factors shows that Mr. Odneal has not met his burden. The Court addresses each factor in turn, beginning with the weightiest factor.

### i. *Mr. Odneal is Unlikely To Succeed on the Merits.*

Mr. Odneal is unlikely to succeed on the merits of his claims. To be sure, movants need not show that they are more likely than not to prevail on the merits, but they must show they have a "fair chance" of doing so. *Bakambia v. Schnell*, No. 20-CV-1434 (NEB/KMM), 2021 WL 6206405, at *3 (D. Minn. Nov. 19, 2021) (quoting *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013)), *R&R adopted*, 2022 WL 23520 (D. Minn. Jan. 3, 2022). Without a fair chance of success on the merits, injunctive relief is usually denied. *CDI Energy Servs., Inc. v. W. River Pumps, Inc.,* 567 F.3d 398, 402 (8th Cir. 2009)

Mr. Odneal has two separate constitutional claims. First is his claim that the MN DOC policy violates the First Amendment on its face and as applied to him. (Compl. ¶¶

8

46.) Second is his claim that the Defendants violate his due process rights when they mark photos in his email as contraband but do not give him notice or allow him to appeal their decision, instead relying on the sender to resend the images as paper copies so he can appeal them when they are again denied in the mailroom. (Compl. ¶¶ 31–33; 47.)

### a. *Mr. Odneal's First Amendment Claim Will Likely Fail.*

When prisoners allege a violation of their civil rights, the judiciary must balance two competing priorities. *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018) On one hand, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). On the other, courts recognize that the task of prison administration is properly assigned to the executive and legislative branches, and they exercise particular restraint when a state penal system is involved. *Id.* at 84–85; *Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) (observing that courts are "ill equipped to deal with the difficult and delicate problems of prison management" (internal quotations omitted)) To strike this balance, the United States Supreme Court has said that prisoners retain those constitutional rights "that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." *Turner*, 482 U.S. at 89. When courts evaluate the constitutionality of a prison policy, they ask if it is "reasonably related to legitimate penological interests." *Thornburgh*, 490 U.S. at 404 (1989) (quoting *Turner*, 482 U.S. at 89). In answering the question, courts apply the four non-exhaustive factors articulated in *Turner v. Safley*:

> (1) whether a valid, rational connection exists between the regulation and
> the legitimate interest asserted to justify it; (2) whether alternative means
> of exercising the right remain available to inmates; (3) the extent to which
> accommodating the asserted right will impact guards and other inmates,
> as well as allocation of prison resources; and (4) whether ready
> alternatives to the regulation at issue are apparent.

*Wickner v. McComb*, No. 09-CV-219 (DWF/JJK), 2010 WL 3396918, at *3 (D. Minn. July

23, 2010), *R&R adopted*, 2010 WL 3396921 (D. Minn. Aug. 23, 2010) (applying the test

in another case about MN DOC's policy regarding nudity and sexually explicit content).

To evaluate MN DOC's contraband policy, this Court must apply these four factors.[4]

**The first *Turner* factor** asks "whether the governmental objective underlying the

regulations at issue is legitimate and neutral" and if "the regulations are rationally related

to that objective." *Thornburgh*, 490 U.S. at 414. A regulation is considered neutral when

"prison administrators draw distinctions between publications solely on the basis of their

potential implications for prison security." *Id.* at 415–16. The DOC restricts prisoners'

access to nudity and sexually explicit materials for three reasons. (McComb Decl. ¶¶ 7–9.)

First, when such materials enter the facility, they can cause a security risk because they can

be traded for other contraband items, become the subject of extortion demands, or be used

to pay gambling debts. The underground prison economy creates tensions that result in

---

[4] While courts scrutinize allegations of a deprivation of First Amendment freedoms in
prison carefully, this and previous versions of MN DOC Policy 301.030 have been upheld.
*Prow v. Roy*, No. 15-CV-3857 (PAM/SER), 2017 WL 9274767, at *4 (D. Minn. June 21,
2017) (collecting cases from this District), *R&R adopted*, 2017 WL 3251559 (D. Minn.
July 31, 2017), *aff'd*, 717 F. App'x 649 (8th Cir. 2018); *Yaritz v. Schnell*, No. 22-CV-2042
(PAM/DTS), 2023 WL 3721630, at *3 (D. Minn. May 30, 2023), *appeal filed*, No. 23-
2457 (8th Cir. June 20).

violence amongst prisoners and require prison guards to break up fights. Because the sexually explicit material is often of women, the material also undermines the authority of female officers. (*Id.*) Second, because the materials can circulate throughout the facility, they can interfere with the treatment of sex offenders, whose access to sexual images is strictly controlled. (*Id.*) Third, sexually explicit images create a hostile work environment for staff. (*Id.*) Not only are staff exposed to the materials in the course of their duties, but prisoners can also use the images to sexually harass female staff. (*Id.*)

Courts have routinely found that institutional security, treatment of sex offenders, and creating a safe working environment are all legitimate penological goals that justify regulating nudity and sexually explicit content in the prison setting. *See, e.g.*, *Jackson v. Gutzmer*, No. 16-CV-3831 (JRT/BRT), 2018 WL 7572492, at *6 (D. Minn. Sept. 28, 2018); *Baasi v. Fabian*, No. 09-CV-781 (PAM/RLE), 2010 WL 924384, at *12 (D. Minn. Mar. 11, 2010) ("Courts have long recognized that each of those goals is neutral and legitimate"), *aff'd*, 391 F. App'x 571 (8th Cir. 2010); *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (finding security and rehabilitation to be legitimate objectives unrelated to the suppression of expression). Policy 301.030 is neutral because it regulates content based on what is harmful or helpful to these three objectives, and not on any other metrics. *Smith v. Roy*, No. 10-2193 (JRT/TNL), 2012 WL 1004985, at *9 (D. Minn. Jan. 25, 2012) (noting that the definition of neutrality in this context is distinct from "the First Amendment notion of content neutrality"), *R&R adopted sub nom. Smith v. Fabian*, No. 10-CV-2193 JRT/TNL, 2012 WL 1004982 (D. Minn. Mar. 26, 2012). Its goals are safety, rehabilitation, and a healthy workplace, not the suppression of expression. *Dawson*, 986 F.2d at 261

11

(explaining a regulation is neutral if it furthers "an important or substantial governmental interest unrelated to the suppression of expression" (quoting *Thornburgh*, 490 U.S. at 415).)

Mr. Odneal himself does not challenge the legitimacy of these goals. (Pl.'s Reply 1, 3.) He does not challenge the policy "as a whole" but challenges the definition of nudity that includes a person wearing clothing that fits so tightly that an outline of their genitals is visible because, according to him, "wearing clothing in any way does not constitute nudity by any standard." (*Id.* at 2.) The MN DOC's definition of nudity may be counterintuitive to Mr. Odneal, but he has not shown that the policy lacks a rational relationship to the legitimate interests described above. If photos of tight-fitting clothing showing the contours of genitals were permitted, they would circulate just as other contraband—say pictures of naked people covered in body paint—does in prison, making the prison less safe, less rehabilitative, and more hostile to staff. Mr. Odneal has not provided evidence to the contrary.

Mr. Odneal also notes that there are no sex offender treatment programs at MCF-Stillwater, so the goal of furthering rehabilitation is inapplicable here. (Pl.'s Reply 3.) While this argument ignores the fact that offenders move from facility to facility within the MN DOC, the Court agrees that the absence of sex offender treatment programs at MCF-Stillwater makes this factor less weighty than the others. That said, there is a risk that images which would interfere with sex offender rehabilitation will travel from a facility without a treatment program to a facility with treatment program as prisoners (and their property) are relocated. It is also reasonable for MN DOC to have a single policy to apply

to all mail quickly and easily. This ensures similar treatment among prisoners in all MN DOC prisons and simplifies training for MN DOC staff. The first *Turner* factor weighs in Defendants' favor.

   **The second *Turner* factor** is whether prisoners have an alternative way to exercise their constitutional rights. *Thornburgh*, 490 U.S. at 417. The right at issue is construed "sensibly and expansively." *Id.* Courts considering similar restrictions have found this factor easily satisfied because prison policy still allows a broad range of publications in the institution. *Yaritz*, 2023 WL 3721630, at *2; *Smith*, 2012 WL 1004985, at *10; *Baasi*, 2010 WL 924384, at *15. Here, the MN DOC policy allows photographs of "cleavage, bare buttocks with thongs, and breasts with bikini tops," as well as non-explicit material. (McComb Decl. ¶ 10.) The second *Turner* factor weighs in favor of Defendants.

   **The third *Turner* factor** is whether "accommodating the asserted right" would negatively impact others in the prison, from guards to other prisoners. *Thornburgh*, 490 U.S. at 418. In other cases challenging prison policies on sexually explicit material, courts have hypothesized what effect removing the policies altogether would have and, finding such a development would put guards at greater risk of assault or harassment, determined that the cost is too great. *Id.* ("Where, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike' . . . the courts should defer to the 'informed discretion of corrections officials[.]'" (quoting *Turner*, 482 U.S. at 92)); *Jackson*, 2018 WL 7572492, at *7; *Wickner*, 2010 WL 3396918, at *5;

Mr. Odneal is not asking the Court to find the whole policy unconstitutional, however. (Pl.'s Reply 1.) He takes issue with the definition of nudity specifically because it includes people wearing "tight-fitting clothing through which the contours of the genitals are clearly visible," and he believes such people cannot, by definition, be nude because they are wearing clothing. The right asserted here is the right to access "non-nude" photos that violate the current nudity policy as written. But re-writing MN DOC's policy to allow for these images would introduce materials not currently available in MN DOC. Those images would have a high value in the prison economy—at least at first—and could contribute to just the kind of transactions that increase the risk of prison violence. This would put other prisoners and guards at risk. In addition, the introduction of more explicit images would have a negative effect on staff, from those who are harassed with such images to those who are frequently exposed to them in the mailroom or in cell searches. The increase in demand for such photos could put more stress on the mailroom[5], causing delays in the timely deliver of mail, which is a lifeline for prisoners maintaining contact with their attorneys, the courts, and their families. Mr. Odneal has not shown that changes to the policies would not negatively impact those who live and work at MCF-Stillwater. The third *Turner* factor weighs against him.

---

[5] Mr. Odneal argues that any claim of burden on the mailroom is disingenuous because policies already determine how many photos prisoners are allowed to receive in their mail and retain in prison. (Pl.'s Reply 3.) The fact that a policy exists does not mean the policy is followed; the mailroom presumably receives mail that exceeds these limits—otherwise there would be no need for a policy—and ensuring that these policies are complied with takes up time for mailroom staff.

**The fourth *Turner* factor** asks if there are other reasonable alternatives to the policy. If there are "obvious, easy alternatives" to prison regulations, that may be evidence that the regulations are "not reasonable," but instead an "exaggerated response" to prison officials' concerns. *Thornburgh*, 490 U.S. at 418 (quoting *Turner*, 482 U.S., at 90–91) ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.") That said, prison officials do not have to impose the least restrictive policy possible;[6] the policy just needs to be reasonable. *Dawson*, 986 F.2d at 262 n.8; *Duwenhoegger v. King*, No. 10-CIV-3965 (PJS/JSM), 2012 WL 1516865, at *11 (D. Minn. Feb. 13, 2012), *R&R adopted*, 2012 WL 1529300 (D. Minn. Apr. 30, 2012). If prison officials reject a less restrictive policy because of "reasonably founded fears" that it will cause greater harm than the existing policy, considering not only the substance of the policy but its "administrative inconvenience," they can avoid the inference that strictness of the policy is an "exaggerated response. " *Thornburgh*, 490 U.S. at 419.

But, as Defendants note, Mr. Odneal has not offered an alternative policy that would allow him to exercise his asserted right at a de minimis cost to prison objectives. (Defs.' Mem. Opp'n Prelim. Inj. 12–13.) Defendants argue that the "hundreds, and sometimes thousands, of nude photographs sent" to MN DOC facilities need review by mail workers who are also "processing all of the regular mail and packages that arrive at the facility."

---

[6] Mr. Odneal's statements to the contrary are unsupported by law. (*See, e.g.*, Compl. ¶ 21.)

(*Id.*) Any alternative to the current policy would tax the limited resources available. Because Mr. Odneal has not put forward any alternative policy, the fourth and final *Turner* factor does not favor him. *See Yaritz*, 2023 WL 3721630, at *3; *Jackson*, 2018 WL 7572492, at *8.

With all four *Turner* factors against him, Mr. Odneal has not shown that he has a fair chance of success on his facial challenge to Policy 301.030; his chances are even poorer for his as-applied challenge. The *Turner* factors analyzed above apply equally well to an as-applied challenge as to a facial challenge. *Hodgson*, 2009 WL 2972862, at *8; *Yaritz*, 2023 WL 3721630, at *3. In deciding if a prison regulation is unconstitutional as applied, courts focus on whether there were legitimate reasons to apply the policy in the case at bar. *Wickner*, 2010 WL 3396918, at *6. The question is not whether the policy was applied correctly or incorrectly. *Id.* ("Plaintiff's entire argument focuses on whether the photographs were encompassed by the policy (i.e., whether the photographs were 'nude' photographs) . . . Plaintiff wants the Court to decide how well the prison officials applied their own policy. This, however, is not the standard for deciding whether Plaintiff's constitutional rights have been violated.") Mr. Odneal does not explain why there was no legitimate reason to apply the mail and contraband policies to his mail specifically[7], or why there was no legitimate reason to apply the policy to individual pieces of his mail, except

---

[7] The Court also notes that Mr. Odneal is himself a convicted sex offender. *See Yaritz*, 2023 WL 3721630 at *3 ("Yaritz's conviction bolsters the conclusion that the policy is constitutional as applied . . . Yaritz was convicted of an extremely serious sexual offense involving a minor female . . . The details of Yaritz's offense inform the DOC officials' decisions when applying the policy to his possession of sexually explicit material.")

16

insomuch as he disagrees with the policy definitions. Therefore, he is unlikely to succeed on his as-applied claim.

### b. Mr. Odneal's Due Process Claim is Unlikely to Succeed.

Mr. Odneal also claims that the MN DOC policies regarding email infringe on his right to procedural due process.[8] (Compl. ¶¶ 27–34.) He challenges the portion of the policy which allows MN DOC to reject emails and attachments to email that violate the contraband policy without notice to the inmate intended to receive them. (*Id.*; Odneal Decl. Ex. 1 at 11 (an annotated copy of policy 301.030 that states the *sender* of the message will be electronically notified of the rejection and the sender may "send the same content through written correspondence and, if it is rejected again, may appeal" using the appeal procedures for paper mail[9].) Mr. Odneal claims that he purchased photos of "non-nude" models, but only a fraction of his purchases were eventually delivered to his email account. (*See, e.g.*, Compl. ¶ 31 (13 of 50 digital photos received in February 2020); Odneal Decl., Ex. 1 at 1–2, 15 (0 out of 13 digital catalogs received, 0 out of 10 videos received, 11 of 41 digital photos received in January 2023); *id.* at 5–7, 16 (1 out of 20 print photos received

---

[8] The Court understands that Mr. Odneal is not claiming a substantive due process violation. He has not alleged that confiscating sexually explicit contraband shocks the contemporary conscience. *See Jackson*, 2018 WL 7572492, at *9 (listing elements of a substantive due process claim and recommending a grant of summary judgment on the claim to MN DOC); *Braun v. Walz*, No. 20-CV-333 (DSD/BRT), 2021 WL 268321, at *10 (D. Minn. Jan. 27, 2021), *R&R adopted*, 2021 WL 1171693 (D. Minn. Mar. 29, 2021) (also listing elements and recommending MN DOC's motion to dismiss be granted).

[9] Note however, that when "unallowable incoming" postal mail is not delivered, the sender is not notified; instead "[t]he offender is responsible for informing the sender of denied item(s)." (McComb Decl. ¶ 3, Ex. 1 at 7.)

in June 2023).) He concludes that the remaining photos were rejected "without notice, reason, or appeal process," in violation of his due process rights. (Compl. ¶ 31.)

His claim is unlikely to succeed. To show a due process violation, a plaintiff must show that he lost a protected liberty or property interest. *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009). After the plaintiff demonstrates their loss, courts determine the process of law that the plaintiff was entitled to based on "the specific interest affected, the likelihood the challenged action would result in an erroneous deprivation of that right, and the burden of providing additional procedures, including administrative costs and burdens." *Id.* (citing *Senty–Haugen v. Goodno,* 462 F.3d 876, 886 (8th Cir.2006) and *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Supreme Court and the Eighth Circuit have both held that prisoners have a liberty[10] interest in uncensored communications.

> In *Procunier v. Martinez,* the Supreme Court held "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment."

*Bonner*, 552 F.3d at 676 (citing *Procunier*, 416 U.S. 396, 417 (1974), *overruled on other grounds by Thornburgh,* 490 U.S. 401); *see also Frost v. Symington*, 197 F.3d 348, 353 (9th Cir. 1999) (recognizing a liberty interest in receiving notice of prison mail withholding). The liberty interest involved is the same regardless of the form of

---

[10] The liberty interest is distinguished from a property interest. Prisoners do not have a property interest in contraband. *Jackson v. Gutzmer*, No. 16-CV-3831 (JRT/BRT), 2018 WL 7572492, at *8 (D. Minn. Sept. 28, 2018) (citing *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984)).

18

correspondence. *Id.* at 676-77, 680; *Emery v. Kelley*, No. 18-CV-55 (DPM/BD), 2018 WL 5779593, at *2 (E.D. Ark. Oct. 3, 2018) ("[W]hile Mr. Emery does not have a first amendment right to email communication, he has a due process right to receive notice when his communication has been censored."), *R&R adopted*, 2018 WL 5779505 (E.D. Ark. Nov. 2, 2018). Minimal procedural safeguards are required when a prison censors inmates' incoming mail; these safeguards include notice, opportunity to object, and opportunity to appeal to a decisionmaker who was not involved in the initial censorship decision. *Smith*, 2012 WL 1004985, at *15; *Wickner*, 2010 WL 3396918, at *8–9; *see also Ping v. Raleigh*, 205 F.3d 1347 (8th Cir. 2000) (unpublished) (finding adequate safeguards when incarcerated plaintiff "received verbal and written notice . . . that play-by-mail games would be banned, and he was able to contest the ban by filing numerous grievances and appeals to parties not involved in the censorship decision.")

Here, even if Mr. Odneal establishes that he has a liberty interest in uncensored mail, he does not explain why he is likely to prevail on his claim that the necessary procedural safeguards were not followed in his case. To start, it appears that Mr. Odneal either received notice from the prison that his mail was being withheld (*see* Odneal Decl. Ex. 1 at 6 ("notice of non-delivery of mail/package")) or had actual notice of the non-delivery of his digital mail because he knew how many products he purchased and how many were delivered via email.[11] At this stage of the litigation, it does not appear likely that Mr. Odneal can show that he was denied notice of the censorship he challenges. *Heard v. Chavez*, 699 F. App'x

---

[11] Again, the sender of the email receives notice when an email is rejected. (McComb Decl. Ex. 3 at 25.)

788, 791 (10th Cir. 2017) ("[Plaintiff] cites no authority, nor are we aware of any, for the proposition that the notice component of a due process claim can be violated even when actual notice is accomplished.") Nor does he argue that a delay in notice prevented him from properly grieving the issue. *See Bonner*, 552 F.3d at 679 (dismissing argument that actual notice was adequate when plaintiff claimed he suffered harm from not receiving timely notice).

Further, Mr. Odneal is unlikely to show that the grievance procedures at MN DOC are inadequate under the Due Process Clause of the Constitution. While there is not a process for prisoners to appeal rejected emails, senders can re-send the rejected images through the mail room, and if they are denied, prisoners receive notice and can appeal the denial through the normal mailroom grievance procedure. Alternatively, if prisoners are concerned that the material they are ordering will be censored, they can choose to order the material in physical form so they can take advantage of the appeals process for postal mail right away. Mr. Odneal, who bears the burden of showing he is likely to succeed on the merits of his case, has not shown that the absence of a direct appeal process for digital images is likely to violate the Due Process Clause.

Because Mr. Odneal has not shown he has a fair chance of success on the merits of either his First Amendment or Due Process claim, the first *Dataphase* factor weighs against entering a preliminary injunction.

### ii.    *Threat of Irreparable Harm*

The next *Dataphase* factor asks whether Mr. Odneal has shown that he will suffer irreparable harm without an injunction. *Dataphase*, 640 F.2d at 113. Irreparable harm is

the kind of harm that is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (quoting *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). Harms that can be redressed with money damages are not irreparable. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667 (8th Cir. 2022). In contrast, even a short deprivation of First Amendment freedoms is "unquestionably" an irreparable injury. *Duwenhoegger*, 2012 WL 1516865, at *6 (quoting *Elrod v. Burns*, 427 U.S. 347, 343 (1976)). If the party requesting a preliminary injunction cannot show irreparable harm, the Court may deny the request for an injunction on that basis alone. *Tumey*, 27 F.4th at 667.

Mr. Odneal claims that he has suffered irreparable harm "in the form of loss of property and money." (Odneal Decl. 2.) Mr. Odneal's economic injuries can be cured with money damages, so he cannot demonstrate irreparable harm on that account. He further claims that he is unlikely to purchase any materials that he believes should be allowed under the policy—but fears will be rejected—until this litigation resolves. (*Id.*) Reading Mr. Odneal's pro se filings liberally, he claims that the chilling effect that the MN DOC policy has on his expression is a First Amendment violation. But as explained above, Mr. Odneal has not shown a fair chance of success on his claim, so this factor weighs against imposing a preliminary injunction. *See Hum. Rts. Def. Ctr. v. Sherburne Cnty.*, No. 20-CV-1817 (ADM/HB), 2020 WL 7027840, at *6 (D. Minn. Nov. 30, 2020) (finding that irreparable harm factor weighed against granting preliminary injunction when plaintiff had not shown likelihood of success on First Amendment claim and delayed in bringing action); *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1045 (D. Minn. 2010) (finding plaintiff's low

21

likelihood of success on his First Amendment claim weighed against a finding of irreparable harm). The second *Dataphase* factor weighs against entering a preliminary injunction.

### iii.    Balance of the Harms

The third *Dataphase* factor asks courts to balance the threat of irreparable harm to the movant with the harm the proposed injunction would cause. 640 F.2d at 114. Mr. Odneal's allegation of irreparable harm is based on the chilling effect MN DOC's contraband policy has on his free expression. The Court must weigh Mr. Odneal's inability to possess sexually explicit or nude images with the harm his preliminary injunction would impose. He specifically asks that the named defendants not be allowed to participate in searches of his mail and property for contraband, and that their successors in office, employees, and agents not use the definitions of nudity and sexually explicit content in reviewing his mail. If this injunction were granted, MN DOC employees reviewing Mr. Odneal's property would need to apply a "contemporary community standard" in determining what constitutes "nudity" and "sexually explicit" content, based on the policies of other "similarly situated correctional" facilities. ([Proposed] Order to Show Cause for a Preliminary Injunction 1.) Such an order would require the MN DOC to reconfigure its mailroom assignments and come up with a new policy just for Mr. Odneal's mail. This would undoubtedly increase the burdens on the prison mailroom and require employees to spend more time screening Mr. Odneal's mail for contraband, leading to delay in delivering mail to other inmates.

Further still, if Mr. Odneal is allowed to possess photos and images that directly violate the MN DOC contraband policy, he could share that content with others and frustrate the objectives of the contraband policy before his case is adjudicated on the merits. Compared to these harms, Mr. Odneal's inability to possess certain sexually explicit content is minimal; this factor weighs against granting his request for a preliminary injunction.

### iv.    Public Interest

The final *Dataphase* factor concerns the public interest. The public has an interest in protecting First Amendment freedoms. *Hum. Rts. Def. Ctr.*, 2020 WL 7027840, at \*7. But the public interest is less weighty in cases like this one, where the moving party has failed to show a likelihood of success on the merits. *Id.*; *Prow*, 2016 WL 8453512, at \*7. There is also the countervailing interest of prison security to consider; imposing the suggested preliminary injunction could frustrate the safety goals of the contraband policy, putting prisoners and guards at greater danger than they would be without the injunction. Finally, the injunction would interfere with the efficient functioning of the prison mail system, which is critical for prisoners who wish to maintain ties to their community and access the courts. Because this factor—and all the *Dataphase* factors—weigh against imposing Mr. Odneal's preliminary injunction, the Court recommends his motion be denied.

23

### III.    THE MOTION TO COMPEL IS DENIED BECAUSE INTERROGATORY FOUR REQUESTS IRRELEVANT INFORMATION.

In his complaint, Mr. Odneal claims that MN DOC employees are abusing the contraband policy to impose their "personal bias" on inmates. (Compl. ¶ 46; *see also id.* ¶¶ 17, 19, 20, 23, 24.) To examine this alleged bias, he served Interrogatory Four on Defendants, which reads: "Do you hold or follow any religious practices or faiths; if so, please list the title of that religion, or spiritual belief, and how often you attend those services or gatherings?" (Wright Decl., Ex. 1 at 2.) Defendants objected: "The Defendants object to this request because it is irrelevant and not pertinent to Odneal's claims. Answering this request will not reasonably lead to the discovery of admissible evidence because any particular Defendant's religious affiliation has no bearing on DOC policies or the enforcement of those policies." (Wright Decl., Ex. 2 at 20.) The parties exchanged letters on this issue but remained at impasse, so Mr. Odneal filed this motion. (*See* Pl.'s First Set of Interrogatories to Defs., Dkt. Nos. 56, 56-1.)

### A. Legal Standard

Parties in civil cases can discover nonprivileged information "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The requesting party has the burden of showing the information's relevance. *Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. Apr. 26, 2021) (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)). Then, "the party resisting production bears the burden of establishing lack of relevancy or undue burden." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-CV-3183 (ADM/LIB), 2016 WL 6997113, at *7 (D. Minn. Sept. 6, 2016) (quoting *Saint*

*Paul Reinsurance Co. v. Com. Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa Nov. 22, 2000)). This is a broad disclosure standard but it is not boundless; parties can discover only that information which is "proportional to the needs of the case," considering "the importance of the issues," "the amount in controversy," "the parties' relative access to relevant information," their resources, how important the discovery is in resolving the issues, and "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). When a requesting party believes its discovery requests are relevant and proportional, but a responding party has failed to provide the requested information, the requesting party may make a motion to compel the responding party's production. Fed. R. Civ. P. 37(a)(3), (5).

### B. Analysis

Mr. Odneal argues he is entitled to an answer on interrogatory number four "because the inspection process of materials by the Defendants allows for personal discretion . . . specifically related to what is Non Nude, Nude, and Sexually Explicit materials." (Pl.'s Mot. Compel. 1.) Mr. Odneal wants to know how individual reviewers' beliefs influence their application of the policies that he challenges. (*Id.*) As he puts it, he wants to "gauge what the Defendant's [sic] moral guidelines are pertaining to said materials so as to create a basis for their moral decision making." (*Id.*) The MN DOC responds that any such bases for moral decision making are irrelevant; staff simply enforce the policy as written, regardless of their religious, or spiritual beliefs about the depiction of nudity or sex. (Defs.' Mem. Opp'n Mot. Compel 3, Dkt. No. 57.) Therefore, any information about staff's

religious or spiritual affiliation is irrelevant, and the Defendants would be unnecessarily harmed by the disclosure of this personal information. (*Id.*)

Defendants are correct. When deciding whether the policy violates Mr. Odneal's rights, the question becomes whether the policy itself is reasonable and whether it is reasonable as applied to him in this instance. *See Wickner*, 2010 WL 3396918, at *4. Defendants' religious practices have no bearing on either question. The policy will be either reasonable or unreasonable regardless of whether the Defendants are of one faith, another faith, or no faith at all. While Mr. Odneal claims that individual mailroom employees may come to different decisions about whether to permit the same picture, he is only speculating that these differences are based on different personal beliefs about nudity, as opposed to differences in professional judgment.

## RECOMMENDATION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 42) be **DENIED**.

## ORDER

Further, based on the same files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel (Dkt. No. 54) is **DENIED.**

Date: January 8, 2024                          *s/ John F. Docherty*
                                              JOHN F. DOCHERTY
                                              United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).