## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SHAWN K. ODNEAL,                                Case No. 22-CV-3107 (JRT/JFD)

                    Plaintiff,

v.                                                        **ORDER**
                                                          **and**
PAUL SCHNELL, GUY BOSCH,                    **REPORT AND RECOMMENDATION**
MARRISA WILLIAMS, STEPHANIE
HUPPERT, JENNY CARUFEL, ERIC
HENNEN, LEIGH MCCOY, CELEST
AILERU,
                    Defendants.

This matter is before the Court on cross-motions for summary judgment. (Dkt. Nos. 60, 63.) The case was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Mr. Odneal claims the definitions of "nudity" and "sexually explicit" in the contraband policy of the Minnesota Department of Corrections ("MN DOC") violate his First Amendment and Due Process rights. (Compl. ¶¶ 13, 19, 23, 33, Dkt. No. 1-1; Pl.'s Mot. Summ. J., Dkt. 60.) The Court recommends denying Mr. Odneal's Motion for Summary Judgment and granting the Defendants' Motion for Summary Judgment (Dkt. No. 63).

## I.    BACKGROUND

This Court has extensively detailed the background of this case in a previous Order and Report and Recommendation. (Order and R. & R., Dkt. No. 73.) Accordingly, the

Court incorporates the following background information from that Order, with additions

and citations where appropriate.

This lawsuit concerns state prisoners' access to sexually suggestive photos. MN

DOC policy allows inmates to receive photos through paper mail and as attachments to

email but prohibits inmates from receiving photos containing nudity or other sexually

explicit content. (Declaration of Mary McComb ("McComb Decl.") ¶ 3, Ex. 1, Dkt. No.

50-1, MN DOC Policy 302.020 (regarding mail); *id.* Ex. 2, Dkt. No. 50-1, MN DOC Policy

301.030 (regarding contraband).) The contraband policy—Policy 301.030—prohibits

> Published or unpublished sexually explicit materials that contain depictions
> or written descriptions of prohibited content including such as . . . (1) Nudity,
> (2) Direct physical stimulation of unclothed genitals, (3) Masturbation, (4)
> Sexual intercourse (including vaginal, oral, anal, or bestiality), (5) Bodily
> fluids, (6) Flagellation or torture in a sexual context, and (7) Sex-related
> materials determined to constitute a risk to the safety and security of the
> facility, facilitate criminal activity, or undermine offender/resident
> rehabilitation.

(McComb Decl. ¶ 3, Ex. 2 at 14–15. [1]) The policy defines nudity as

> [T]he depiction of human male or female genitals, anus, or pubic area or of
> the female breast or a substantial portion of the breast below the top of the
> nipple, with or without see-through covering, such as "pasties," lace, mesh,
> and body paint through which the covered area is showing; coverings
> emphasizing the depiction of human genitals; or tight-fitting clothing through
> which the contours of the genitals are clearly visible.

(*Id.* at 14.)

Each MN DOC facility receives hundreds of nude photos through the mail per week,

and the policy's definition of nudity is designed to be applied "consistently and quickly"

---

[1] All references to page numbers are to the pagination assigned by the CM/ECF filing
system.

so that staff can process the large volume of mail the prisons receive daily. (McComb Decl. ¶ 11.) MN DOC staff review all incoming mail to determine whether it contains contraband. (McComb Decl. ¶ 4, 11.) If contraband is found, the mail is not delivered to the prisoner; instead, the prisoner receives a notice of non-delivery that explains why the mail was rejected. (*Id.* ¶ 3, Ex. 1 at 7–8.) If a prisoner wishes to challenge a determination that a piece of mail contains contraband, they can appeal it to the mailroom supervisor, then to the Correspondence Review Authority, which is a group of individuals who are all senior to the mailroom supervisor and mailroom staff. (McComb Decl. ¶ 4.)

Prisoners can also receive photographs through email hosted on kiosks in the prison. (McComb. Decl. ¶ 12) The contraband policies apply equally to email as they do to postal mail, and attachments to emails are screened by mailroom staff. (*Id.* ¶ 13.) If a picture attached to an email violates the contraband policy, it is not delivered. (Second Declaration of Mary McComb ("Second McComb Decl.") ¶ 4, Dkt. No. 65.) Staff reviewing the picture enter the reason for the non-delivery in the kiosk service provider software, and the sender of the message is notified of the rejection and the basis for it. (*Id.*) Prisoners are not notified of the non-delivery and they cannot appeal the rejection of an email because the MN DOC does not take possession of the electronic items. (*Id.*) The sender, who does receive a notice of non-delivery, may send the same content through the physical mail, and when the mailroom issues a notice of non-delivery to the prisoner, the prisoner can appeal that denial. (*Id.*) The MN DOC has two rationales for not having a direct appeal process for rejected emails. First, more than 50,000 photographs can be received in inmate mail each month, a volume that makes it impractical to institute a direct appeal process. (Second McComb

Decl. ¶ 2.) Second, MN DOC does not retain the images attached to the emails anyway, meaning the item whose non-delivery is at issue cannot be looked at during a non-delivery appeal process. (Second McComb Decl. ¶ 2.) As to the alternative of printing photographs that MN DOC will not deliver, according to MN DOC officials, it is "simply not feasible for MN DOC staff to print and retain rejected photographs" so that prisoners can appeal the rejection of email in the same way that they can appeal the rejection of postal mail. (*Id.*; McComb Decl. ¶ 13.)

Mr. Odneal is confined to the Stillwater facility of the Minnesota Department of Corrections (MCF-Stillwater). (Compl. ¶ 3; McComb Decl. ¶ 5.) He is serving a life sentence for two counts of First Degree Aggravated Sexual Assault on a Child. (Declaration of Sarah Knoph ¶¶ 2–3, Exs. 1–2, Dkt. No. 49-1.) During the years he has been incarcerated in Minnesota, Mr. Odneal claims to have purchased hundreds, if not thousands, of "non-nude"[2] photographs from vendors that sell sexual images to prisoners. (Compl. ¶ 13; *see also* McComb Decl. ¶ 11.) The MN DOC has refused to deliver certain photos Mr. Odneal purchased and had sent to him via postal mail and through his prison email because they were considered contraband. (Declaration of Shawn K. Odneal ("Odneal Decl.") 1–2, Dkt. No. 42; Pl.'s Mem. Supp. Prelim. Inj. Ex. 1 at 6, Dkt. No. 45-1 (reprinting notice of non-delivery); Compl. ¶¶ 30–31 (regarding email).) When he attempted to appeal the non-delivery of the emailed photos, the MN DOC informed him that decisions about email attachments could not be appealed, and that if he wanted to

---

[2] Mr. Odneal uses the term "non-nude" to describe images that he says show "clothed" individuals but purportedly violate MN DOC policy.

appeal the decision, the sender needed to resend the images through the postal mail. (Compl. ¶¶ 31–32.) If images sent by traditional mail were rejected, Mr. Odneal could appeal the contraband designation using the established process for postal mail. (*Id.*)

Mr. Odneal argues that the MN DOC's "vague" definition of nudity "is being used to intentionally restrict" expressive activity under the First Amendment. (Compl. ¶ 19; *see also* Pl.'s Mot. Summ. J. 1.) Specifically, he says the policy counterintuitively categorizes pictures in which people are "wearing coverings emphasizing the depiction of human genitals" or "tight fitting clothing through which the genitals are clearly visible" as nude pictures when, by definition, their genitals are covered. (Pl.'s Mot. Summ. J. 1.) He also claims that the MN DOC's policy of non-delivery of email attachments is "without notice, reason, or appeal process" and so violates his right to due process. (Compl. ¶¶ 33–34, 46–47; *see also* Pl.'s Mot. Summ. J. 10–11.) Defendants are the Commissioner of MN DOC, the warden of MCF-Stillwater, and other MCF-Stillwater staff. (Compl. ¶¶ 4–11.) Mr. Odneal seeks declaratory relief, injunctive relief, compensatory damages, and punitive damages. (Compl. ¶¶ 1, 49–52.)

After filing his initial complaint under 42 U.S.C. § 1983, Mr. Odneal continued to purchase digital pictures, catalogs, and videos, spending more than $100 in total. (Odneal Decl. 2; Pl.'s Mem. Supp. Mot. Prelim. Inj. 3; Pl.'s Mot. Summ. J. 4.) Some of these pictures made it through screening and some did not. (Pl.'s Mot. Summ. J. 4.) According to him, he was allowed to possess catalogs advertising pictures of models but when he tried to order the images in those catalogs, the images were considered contraband and not delivered. (Pl.'s Mot. Summ. J. 6–7.) In response to these post-filing developments Mr.

Odneal filed a motion for a preliminary injunction seeking to (1) prohibit MN DOC from using its definitions of "nudity" and "sexually explicit" in reviewing his mail, (2) require it to apply a "contemporary community standard" in defining those terms as they relate to his mail, and (3) prohibit the named defendants from having any role in inspecting his property for contraband or participating in any appeals of contraband determinations he may file. (Order and R. & R. 6, Dkt. No. 73; *see* [Proposed] Order to Show Cause for a Preliminary Injunction 1–2, Dkt. No. 44.)

About two months after filing his motion for a preliminary injunction, Mr. Odneal filed a Motion for an Order to Compel Discovery. (Dkt. No. 54.) Defendants objected to Mr. Odneal's Interrogatory Number 4 and Mr. Odneal asked the Court to order them to respond to it. The Court issued a Report and Recommendation that recommended denying Mr. Odneal's motion for a preliminary injunction and denied his Motion to Compel in an Order. (R. & R., Dkt. No. 73.) The District Court adopted the Report and Recommendation. (Order Adopting R. & R., Dkt. No. 76.) Mr. Odneal filed a motion for summary judgment.[3] (Pl.'s Mot. Summ. J., Dkt. No. 60.) Defendants responded by opposing Mr. Odneal's motion and submitting their own motion for summary judgment. (Defs.' Mot. Summ. J.; Defs.' Mem. Supp. Summ. J. Dkt. No. 64.)

The questions before the Court on summary judgment are (1) whether the MN DOC policy violates the First Amendment on its face as "intentionally vague" and as applied to Mr. Odneal, and (2) whether the Defendants violate Mr. Odneal's due process rights when

---

[3] Mr. Odneal also filed a Motion for Summary Judgment on June 23, 2023 (Dkt. Nos. 31), which was denied without prejudice. (Dkt. Nos. 39, 47.)

6

they mark photos in his email as contraband but do not give him notice or allow him to appeal their decision, instead relying on the sender to resend hard copies through physical mail so he can appeal if they are seized in the mailroom. (Compl. ¶¶ 31–33, 47; Pl.'s Mot. Summ. J. at 2, 10–11.)

## II.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material for the purposes of summary judgment if it will affect the outcome of the suit under the governing law. *Id*. at 248; *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Erickson*, 31 F.4th 1048 (quoting *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012)). A reviewing court considers inferences drawn from the facts in the light most favorable to the non-moving party. *United States v. Diebold Inc.*, 369 U.S. 654, 6565 (1962) (per curiam); *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (2022).

Although Mr. Odneal's *pro se* motion is held "to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), Federal Rule of Civil Procedure 56 still applies to his claims. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

7

### III.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED.

#### A. Analysis

##### a. *Mr. Odneal's First Amendment Claim Fails Because the MN DOC Policy is Reasonably Related to Legitimate Penological Interests.*

When prisoners allege a violation of their civil rights, the judiciary must balance two competing priorities. *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018). First, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). But courts recognize that the task of prison administration is properly assigned to the executive and legislative branches, and they exercise particular restraint when a state penal system is involved. *Id.* at 84–85; *Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) (observing that courts are "ill equipped to deal with the difficult and delicate problems of prison management" (internal quotations omitted)). To strike this balance, the United States Supreme Court has said that prisoners retain those constitutional rights "that are not inconsistent with [their] status as a prisoner or with the legitimate penological objectives of the corrections system." *Turner*, 482 U.S. at 89. When courts evaluate the constitutionality of a prison policy, they ask if it is "reasonably related to legitimate penological interests." *Thornburgh*, 490 U.S. at 404 (1989) (quoting *Turner*, 482 U.S. at 89). In answering the question, courts apply the four non-exhaustive factors articulated in *Turner v. Safley*:

> (1) whether a valid, rational connection exists between the regulation and the legitimate interest asserted to justify it; (2) whether alternative means of exercising the right remain available to inmates; (3) the extent to which accommodating the asserted right will impact guards and other inmates,

as well as allocation of prison resources; and (4) whether ready alternatives to the regulation at issue are apparent.

*Wickner v. McComb*, No. 09-CV-219 (DWF/JJK), 2010 WL 3396918, at *3 (D. Minn. July 23, 2010), *R. & R. adopted*, 2010 WL 3396921 (D. Minn. Aug. 23, 2010) (applying the test in another case about MN DOC's policy regarding nudity and sexually explicit content). To evaluate MN DOC's contraband policy, this Court must apply these four factors.[4]

**The first *Turner* factor** asks "whether the governmental objective underlying the regulations at issue is legitimate and neutral" and if "the regulations are rationally related to that objective." *Thornburgh*, 490 U.S. at 414. A regulation is considered neutral when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security." *Id.* at 415–16. The MN DOC restricts prisoners' access to nudity and sexually explicit materials for three reasons. (McComb Decl. ¶¶ 7–9.) First, when such materials enter the facility, they can cause different types of security risk. Sexually explicit materials can be traded for other contraband items, become the subject of extortion demands, or be used to pay gambling debts. The underground prison economy creates tensions that result in violence amongst prisoners and require prison guards to break up fights. Because the sexually explicit material overwhelmingly depicts women, the

---

[4] While courts scrutinize allegations of a deprivation of First Amendment freedoms in prison carefully, this and previous versions of MN DOC Policy 301.030 have been upheld. *Prow v. Roy*, No. 15-CV-3857 (PAM/SER), 2017 WL 9274767, at *4 (D. Minn. June 21, 2017) (collecting cases from this District), *R. & R. adopted*, 2017 WL 3251559 (D. Minn. July 31, 2017), *aff'd*, 717 F. App'x 649 (8th Cir. 2018); *Yaritz v. Schnell*, No. 22-CV-2042 (PAM/DTS), 2023 WL 3721630, at *3 (D. Minn. May 30, 2023), *appeal filed*, No. 23-2457 (8th Cir. June 20, 2023).

material also undermines the authority of female officers who are tasked with maintaining prison security. (*Id.*) Second, because the materials can circulate throughout the facility (and through inmate transfers, to other facilities) they can interfere with the treatment of sex offenders, whose access to sexual images is strictly controlled. (*Id.*) Third, sexually explicit images create a hostile work environment for staff. (*Id.*) Not only are staff exposed to the materials in the course of their duties, but prisoners can also use the images to sexually harass female staff. (*Id.*)

Courts have routinely found that institutional security, treatment of sex offenders, and creating a safe working environment are all legitimate penological goals that justify sexually explicit content and content depicting nudity in the prison setting. *See, e.g.*, *Jackson v. Gutzmer*, No. 16-CV-3831 (JRT/BRT), 2018 WL 7572492, at *6 (D. Minn. Sept. 28, 2018); *Baasi v. Fabian*, No. 09-CV-781 (PAM/RLE), 2010 WL 924384, at *12 (D. Minn. Mar. 11, 2010) ("Courts have long recognized that each of those goals is neutral and legitimate"), *aff'd*, 391 F. App'x 571 (8th Cir. 2010); *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (finding security and rehabilitation to be legitimate objectives unrelated to the suppression of expression).

Not only are these goals legitimate, but Policy 301.030 is also neutral because it regulates content based on what is harmful or helpful to these three objectives, and not on any other metrics. *Smith v. Roy*, No. 10-2193 (JRT/TNL), 2012 WL 1004985, at *9 (D. Minn. Jan. 25, 2012) (noting that the definition of neutrality in this context is distinct from "the First Amendment notion of content neutrality"), *R. & R. adopted sub nom. Smith v. Fabian*, No. 10-CV-2193 (JRT/TNL), 2012 WL 1004982 (D. Minn. Mar. 26, 2012). Its

goals are safety, rehabilitation, and a healthy workplace, not the suppression of expression. *Dawson*, 986 F.2d at 261 (explaining a regulation is neutral if it furthers "an important or substantial governmental interest unrelated to the suppression of expression" (quoting *Thornburgh*, 490 U.S. at 415).)

Mr. Odneal himself acknowledges the Defendants' "compelling interest in security…related to stopping contraband coming into MN DOC." (Pl.'s Mot. Summ. J. 3.) He argues that the "non-nude" photographs entering the facility do not pose the same risk as "nude" photographs entering the facility and that MN DOC's failure to distinguish between the two has placed a "substantial burden" on his First Amendment rights. (*Id.*) However, Mr. Odneal has not shown that the policy on "non-nude" photographs lacks a rational relationship to the legitimate interests described above. As this Court has previously explained, "[i]f photos of tight-fitting clothing showing the contours of genitals were permitted, they would circulate just as other contraband—say pictures of naked people covered in body paint—does in prison, making the prison less safe, less rehabilitative, and more hostile to staff." (Order and R. & R. 12, Dkt. No. 73.) Mr. Odneal has not provided evidence to the contrary other than expounding on other MN DOC policies and inapplicable references to the Offender Orientation Handbook from the Texas Department of Criminal Justice. (Pl.'s Mot. Summ. J. 7–8.)

**The second *Turner* factor** is whether prisoners have an alternative way to exercise their constitutional rights. *Thornburgh*, 490 U.S. at 417. The right at issue is construed "sensibly and expansively." *Id.* Courts considering similar restrictions have found this factor easily satisfied because prison policy still allows a broad range of publications in the

institution. *Yaritz*, 2023 WL 3721630, at *2; *Smith*, 2012 WL 1004985, at *10; *Baasi*, 2010 WL 924384, at *15. Here, the MN DOC policy allows photographs of "cleavage, bare buttocks with thongs, and breasts with bikini tops," as well as non-explicit material. (McComb Decl. ¶ 10.)

Mr. Odneal claims that the second prong of *Turner* requires MN DOC "to prove that their policy is the least restrictive means to uphold their stated interest." (Pl.'s Mot. Summ. J. 9). *Turner*, however, requires no such proof and instead cautions that "courts should be particularly conscious of the measure of judicial deference owed to corrections officials" when evaluating "the validity of the regulation." *Turner*, 482 U.S. at 90. The regulation allows a wide range of photographs to enter the MN DOC facilities that are not contraband. The second *Turner* factor weighs in favor of Defendants.

**The third *Turner* factor** is whether "accommodating the asserted right" would negatively impact others in the prison, from guards to other prisoners. *Thornburgh*, 490 U.S. at 418. In other cases challenging prison policies on sexually explicit material, courts have analyzed what effect removing the policies altogether would have and have found that the cost is too great because such a development would put correctional staff at greater risk of assault or harassment. *Id.* ("Where, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike' . . . the courts should defer to the 'informed discretion of corrections officials[.]'" (quoting *Turner*, 482 U.S. at 92)); *Jackson*, 2018 WL 7572492, at *7; *Wickner*, 2010 WL 3396918, at *5.

Mr. Odneal takes issue with MN DOC's definition of nudity. He points out that the definition includes people wearing "tight-fitting clothing through which the contours of the genitals are clearly visible," and he believes such people cannot, by definition, be nude because they are clothed. (Pl.'s Mot. Summ. J. 5.) As this Court has previously explained, "re-writing MN DOC's policy to allow for these images would introduce materials not currently available in MN DOC." (Order and R. & R. 14, Dkt. No. 73.)

Those previously unavailable images could circulate in a way that puts prisoners and guards at risk. Specifically, the increase in the number of such images that would circulate within correctional facilities if the definition of "nudity" was narrowed would magnify the negative effects already caused to prisoners and staff by these types of images. These images, if allowed, would have increased value for those who barter or trade these images for other items and favors. (McComb Decl. ¶ 7) The value of these images can facilitate dangerous situations in prison settings like the settling of debts or trading for contraband items. (*Id.*) These exchanges can lead to tension and assaults which harms both the incarcerated individuals and staff. (*Id.*)

The introduction of more explicit images would expose staff to those same images during cell and mail searches. (McComb Decl. ¶ 9). These images would also increase the likelihood of sexual harassment already faced by correctional staff, especially female staff. (McComb Decl. ¶ 9 ("incarcerated persons view sexually explicit materials…engage in sexual misconduct in front of female staff, and sexually harass female staff").) Any increase in demand for such photos would also put more stress on the mailroom. Any delay in the timely delivering of mail could result in negative consequences for those inmates

contacting their attorneys, the courts, and their families. (McComb Decl. ¶ 12.) The third *Turner* factor weighs against Mr. Odneal and in favor of the Defendants.

**The fourth *Turner* factor** asks if there are other reasonable alternatives to the policy. "If there are 'obvious, easy alternatives' to prison regulations, that may be evidence that the regulations are 'not reasonable,' but instead an 'exaggerated response' to prison officials' concerns." (Order and R. & R. 15, Dkt. No. 73.) (citations omitted) That said, prison officials do not have to impose the least restrictive policy possible; the policy just needs to be reasonable. *Dawson*, 986 F.2d at 262 n.8; *Duwenhoegger v. King*, No. 10-CIV-3965 (PJS/JSM), 2012 WL 1516865, at *11 (D. Minn. Feb. 13, 2012), *R. & R. adopted*, 2012 WL 1529300 (D. Minn. Apr. 30, 2012). If prison officials reject a less restrictive policy because of "reasonably founded fears that it will lead to greater harm, they succeed in demonstrating" that their selected policy is not an "exaggerated response." *Thornburgh*, 490 U.S. at 419.

Mr. Odneal offers an alternative definition that allows for "lace, mesh, or latex 'pasties' covering the nipples or genitals" to be considered "clothed or covered" consistent with the standards "in public settings." (Pl.'s Mot. Summ. J. 5.) This narrower definition of nudity he argues, would achieve the same penological goals and provide consistent and less vague enforcement. (Pl.'s Mot. Summ. J. 5–7.) Defendants dispute this and argue that "no ready alternative exists." (Defs.' Mem. Supp. Summ. J. 15.) Implementing a new definition of nudity and updating policies and procedures to adhere to that definition across all MN DOC facilities would require significant expenditures of staff time and other resources. The proposed definition would allow more types of images into MN DOC

facilities and the costs in labor and enforcement would be be far from *de minimis*. The fourth and final *Turner* factor weighs against Mr. Odneal and in favor of the Defendants. All four factors weigh against Mr. Odneal and in favor of the Defendants. The Court concludes that the regulation has a reasonable relationship to a legitimate penological objective. Consequently, the regulation is valid, and Mr. Odneal has not shown that a genuine issue of material fact exists that could allow a jury to determine otherwise.

### b. Mr. Odneal's As-Applied Claim Fails Because There Were Legitimate Reasons to Apply the Policy in His Case.

Mr. Odneal challenges the policy as applied to him in three instances. First, Mr. Odneal ordered 20 images on June 2, 2023. Delivery of all of them was denied. (Pl.'s Mot. Summ. J. 4.) He then ordered the same images again on July 27, 2023 and 11 out of the 20 photographs were delivered. (*Id.*) The second instance, Mr. Odneal argues, occurred when he was denied an image that was ordered electronically that was previously allowed through physical mail. (*Id.* at 6.) The third instance involved the approval of a physical catalog from MN DOC staff. (*Id.* at 6–7.) Mr. Odneal was permitted to possess a catalog that advertised a variety of sexually suggestive images at a smaller scale. (*Id.*) Mr. Odneal then ordered an image at a larger scale from that catalog which was denied. (*Id.*) Additionally, Mr. Odneal claims that MN DOC permitted him to have a copy of an order verification card which showed the denied image. (*Id.*) The Defendants hypothesize, in response, that "mailroom staff may not have been able to see the images clearly when they were small." (Defs.' Mem. Supp. Summ. J. 17.)

The *Turner* factors analyzed above apply not only to facial challenges but also to as-applied challenges. *Hodgson v. Fabian*, No. 08-CV-5120, 2009 WL 2972862, at *8 (D. Minn. Sept. 10, 2009); *Yaritz v. Schnell*, No. 22-CV-2042 (PAM/DTS), 2023 WL 3721630, at *3 (D. Minn. May 30, 2023), *appeal filed*, No. 23-2457 (8th Cir. June 20, 2023). In deciding if a prison regulation is unconstitutional as applied, courts focus on whether there were legitimate reasons to apply the policy in the case at bar. *Wickner*, 2010 WL 3396918, at *6. The question is not whether the policy was applied correctly or incorrectly. *Id.* ("Plaintiff's entire argument focuses on whether the photographs were encompassed by the policy (i.e., whether the photographs were 'nude' photographs) . . . Plaintiff wants the Court to decide how well the prison officials applied their own policy. This, however, is not the standard for deciding whether Plaintiff's constitutional rights have been violated.")

The first *Turner* factor weighs in favor of the Defendants. The Court found, in the analysis above, that the policy serves Defendants' legitimate penological interest in maintaining a safe environment for inmates and guards. Mr. Odneal himself is a convicted sex offender and does not explain why there was no legitimate reason to apply the mail and contraband policies to his mail specifically.[5] The second *Turner* factor weighs in favor of the Defendants because Mr. Odneal may obtain photographs and images that are not classified as contraband according to MN DOC policy. In fact, Mr. Odneal did receive

---

[5] *See Yaritz*, 2023 WL 3721630 at *3 ("Yaritz's conviction bolsters the conclusion that the policy is constitutional as applied . . . Yaritz was convicted of an extremely serious sexual offense involving a minor female . . . The details of Yaritz's offense inform the DOC officials' decisions when applying the policy to his possession of sexually explicit material.")

some images although they were initially denied. Although the differing judgments of different prison officials may be frustrating to Mr. Odneal, this does not deny him access to non-contraband images.

The third *Turner* factor asks how accommodating Mr. Odneal's asserted right will impact guards and other inmates, as well as allocation of prison resources, at MN DOC and its facilities. As discussed above, the implementation of a policy that includes a narrower definition of nudity, like the one suggested by Mr. Odneal, would increase the amount of sexually explicit images in circulation within MN DOC. Even if only applied to Mr. Odneal, the increase in these images would negatively impact other inmates and guards. Mr. Odneal's access to otherwise prohibited materials in the MN DOC system would give him items that in the prison context would be extremely valuable. The entire prison system would then be subject to Mr. Odneal's decisions on what to do with the images. The value of these images could also cause disruptions and pose security risks outside of any actions by Mr. Odneal. For example, these images would put him at risk of violence by other prisoners in their efforts to obtain those images.

Resources to review an increased number of images would have to be found within an already constrained corrections system. Prison officials review a high volume of mail and email messages. For example, 54,164 photos were sent to inmates through kiosk services in October 2023 alone. (Second McComb Decl. ¶ 2.) To the detriment of other prisoners using the system for contact with their legal counsel, families, or loved ones outside of prison, MN DOC would have to spend more time reviewing potential contraband within the new definition of nudity that is offered by Mr. Odneal. The MN DOC notes that

"reviewing incarcerated persons' mail is not an attractive job," so staffing to accommodate the workload at all MN DOC facilities affected by the new policy would be challenging. (*Id.*) The third factor weighs against Mr. Odneal and in favor of the Defendants.

Similarly, the fourth *Turner* factor weighs against Mr. Odneal and in favor of the Defendants. If Mr. Odneal "can point to an alternative that fully accommodates" his rights "at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner*, 482 U.S. 78, 91 (1987). The only alternative to which Mr. Odneal points is a narrower definition of nudity, but the Court has already found that the cost of such a narrowed definition would be anything but *de minimis*.

All four *Turner* factors weigh against Mr. Odneal and in favor of the Defendants on Mr. Odneal's as applied challenge. MN DOC has not violated Mr. Odneal's First Amendment rights because the policy is constitutional both facially and as applied to Mr. Odneal. There are no genuine disputes of material facts in this case. Defendants' motion for summary judgment should be granted.

## IV.    MR. ODNEAL'S DUE PROCESS RIGHTS WERE NOT VIOLATED BECAUSE HE HAS NOT LOST A PROTECTED LIBERTY OR PROPERTY INTEREST.

Mr. Odneal also claims that the MN DOC policies regarding email infringe on his right to procedural due process because it deprives him of "notice of denials, as well as an avenue for redress for loss of property." (Pl.'s Mot. Summ. J. 10.) He challenges the portion of the policy which allows MN DOC to reject emails and attachments to email that violate the contraband policy without notice to the inmate to whom they were sent. (Pl.'s Mot.

Summ. J. 11 (citing policy 302.22)); Odneal Decl. Ex. 1 at 11 (an annotated copy of policy 301.030 that states the *sender* of the message will be electronically notified of the rejection and the sender may "send the same content through written correspondence and, if it is rejected again, may appeal" using the appeal procedures for paper mail.[6]) Mr. Odneal claims only a fraction of his purchases of "non-nude" images were eventually delivered to his email account. (Pl.'s Mot. Summ. J. 11 (calculating a loss of $73 for the cost of undelivered images)); *See, e.g.*, Compl. ¶ 31 (13 of 50 digital photos received in February 2020); Odneal Decl., Ex. 1 at 1–2, 15 (0 out of 13 digital catalogs received, 0 out of 10 videos received, 11 of 41 digital photos received in January 2023); *id.* at 5–7, 16 (1 out of 20 print photos received in June 2023).) Mr. Odneal argues that because ordering physical copies of the rejected digital images would cost him more money, with no process for appeal otherwise, he is deprived of his procedural due process rights.[7] (Pl.'s Mot. Summ. J. 11–13.)

To show a due process violation, a plaintiff must show that he lost a protected liberty or property interest. *Bonner v. Outlaw*, 552 F.3d 673, 676 (8th Cir. 2009). After the plaintiff demonstrates their loss, courts determine the process of law to which the plaintiff was entitled based on "the specific interest affected, the likelihood the challenged action would

---

[6] Note however, that when "unallowable incoming" postal mail is not delivered, the sender is not notified; instead "[t]he offender is responsible for informing the sender of denied item(s)." (McComb Decl. ¶ 3, Ex. 1 at 7.) Then the incarcerated person "may appeal the rejection pursuant to the DOC mail policy." (Second McComb Decl. ¶ 4.)

[7] Mr. Odneal cites the First and Fifth Amendment, however, the Court understands Mr. Odneal is making a Due Process claim under the Fourteenth Amendment against the State.

result in an erroneous deprivation of that right, and the burden of providing additional

procedures, including administrative costs and burdens." *Id.* (citing *Senty–Haugen v.*

*Goodno,* 462 F.3d 876, 886 (8th Cir.2006) and *Mathews v. Eldridge*, 424 U.S. 319, 335

(1976)).

The Supreme Court and the Eighth Circuit have both held that prisoners have a

liberty[8] interest in uncensored communications.

> In *Procunier v. Martinez,* the Supreme Court held "[t]he interest of prisoners
> and their correspondents in uncensored communication by letter, grounded
> as it is in the First Amendment, is plainly a 'liberty' interest within the
> meaning of the Fourteenth Amendment even though qualified of necessity
> by the circumstance of imprisonment."

*Bonner*, 552 F.3d at 676 (citing *Procunier*, 416 U.S. 396, 417 (1974), *overruled on other*

*grounds by Thornburgh,* 490 U.S. 401); *see also Frost v. Symington*, 197 F.3d 348, 353

(9th Cir. 1999) (recognizing a liberty interest in receiving notice of prison mail

withholding). The liberty interest involved is the same regardless of the form of

correspondence. *Id.* at 676–77, 680; *Emery v. Kelley*, No. 18-CV-55 (DPM/BD), 2018 WL

5779593, at *2 (E.D. Ark. Oct. 3, 2018) ("[W]hile Mr. Emery does not have a first

amendment right to email communication, he has a due process right to receive notice

when his communication has been censored."), *R. & R. adopted*, 2018 WL 5779505 (E.D.

Ark. Nov. 2, 2018). Minimal procedural safeguards are required when a prison censors

inmates' incoming mail; these safeguards include notice, opportunity to object, and

---

[8] The liberty interest is distinguished from a property interest. Prisoners do not have a
property interest in contraband. *Jackson v. Gutzmer*, No. 16-CV-3831 (JRT/BRT), 2018
WL 7572492, at *8 (D. Minn. Sept. 28, 2018) (citing *Lyon v. Farrier*, 730 F.2d 525, 527
(8th Cir. 1984)).

opportunity to appeal to a decisionmaker who was not involved in the initial censorship decision. *Smith*, 2012 WL 1004985, at *15; *Wickner*, 2010 WL 3396918, at *8–9; *see also Ping v. Raleigh*, 205 F.3d 1347 (8th Cir. 2000) (unpublished) (finding adequate safeguards when incarcerated plaintiff "received verbal and written notice . . . that play-by-mail games would be banned, and he was able to contest the ban by filing numerous grievances and appeals to parties not involved in the censorship decision.")

Mr. Odneal claims that he has a liberty interest in uncensored or "non-nude" photographs through email. While Mr. Odneal acknowledges that the email system is a "privilege," he nonetheless argues that "as long as it is allowable, all of the materials that come in through this process" are constitutionally protected. (Pl.'s Mot. Summ. J. 15.) However, Mr. Odneal does not explain why the necessary procedural safeguards were not followed in his case.

The Court takes up the procedural due process requirements of notice, opportunity to object, and appeal in turn. Mr. Odneal either received notice from the prison that his mail was being withheld (*see* Odneal Decl. Ex. 1 at 6 ("notice of non-delivery of mail/package")) or had actual notice of the non-delivery of his digital mail because he knew how many products he purchased and how many were delivered via email.[9] (Pl.'s Mot. Summ. J. 11 (explaining that he did not receive all the images he ordered).) Mr. Odneal cannot show that he was denied notice of the censorship he challenges. *Heard v. Chavez*,

---

[9] Again, the sender of the email receives notice when an email is rejected "because the sender is the party attempting to introduce contraband into the facility through the kiosk service provider." (Second McComb Decl. ¶ 4.)

699 F. App'x 788, 791 (10th Cir. 2017) ("[Plaintiff] cites no authority, nor are we aware of any, for the proposition that the notice component of a due process claim can be violated even when actual notice is accomplished.") Nor does he argue that a delay in notice prevented him from properly grieving the issue. *See Bonner*, 552 F.3d at 679 (dismissing argument that actual notice was adequate when plaintiff claimed he suffered harm from not receiving timely notice).

Opportunity to object and appeal are intertwined, because under MN DOC policy, an inmate objects to a non-delivery by appealing the non-delivery decision. Mr. Odneal argues that unless he buys the physical photo and uses the mailroom appeal process, he is denied the opportunity to be heard on appeal. Both parties acknowledge that if a digital photograph is ordered but not delivered, the vendor is unlikely to resend the image as a physical photograph. However, Mr. Odneal is not required to order the images twice to appeal a decision. Instead, he can order the physical images and utilize the grievance procedures at MN DOC right away if denied. These procedures are not inadequate under the Due Process Clause of the Constitution simply because they de-incentivize purchasing photos that might be censored online as opposed to on paper. The MN DOC policy satisfies the procedural requirements of the Due Process Clause.

**V.    MR. ODNEAL IS BARRED FROM RECOVERING COMPENSATORY DAMAGES AGAINST THE STATE UNDER THE ELEVENTH AMENDMENT AND IS NOT ENTITLED TO PUNITIVE DAMAGES UNDER 42 U.S.C. § 1983.**

Mr. Odneal has brought his claim against the Defendants under 42 U.S.C. § 1983 which allows people to seek relief for alleged violations of their federal constitutional

rights. (Compl. ¶ 1.) He seeks compensatory damages as well as punitive damages. (Compl.

¶¶ 51–52.) Defendants assert that they are entitled to immunity under the Eleventh

Amendment—which Minnesota has not waived—as to these monetary damages. (Defs.'

Mem. Supp. Summ. J. 22.) "The Eleventh Amendment grants a state immunity from suits

brought in federal court by its own citizens, as well as citizens of another state." *Hodgson*,

2009 WL 2972862, at \*6 (citations omitted). Suing a state official in their official capacity,

as Mr. Odneal has done here by suing MN DOC employees, is essentially suing the state.

*See Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (internal citation omitted).

Therefore, Defendants are entitled to Eleventh Amendment immunity. *Will v. Mich. Dept.*

*of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy

many deprivations of civil liberties, but it does not provide a federal forum for litigants

who seek a remedy against a State for alleged deprivations of civil liberties."). Further,

state officials acting in their official capacity are not covered by § 1983. *Id.* at 71 (holding

that they cannot be "persons" liable under the statute for depriving another of their

constitutional rights); 42 U.S.C. § 1981. As a result, Mr. Odneal could not collect

compensatory damages even if he convinced the Court that Defendants violated his

Constitutional rights.

Punitive damages may be awarded under 42 U.S.C. § 1983 "when the defendant's

conduct is shown to be motivated by evil motive or intent or when it involves the reckless

or callous indifference to the federally protected rights of others." *McAdoo v. Martin*, 899

F.3d 521, 527 (8th Cir. 2018) (citations omitted). For the same reasons that the Court

recommends granting Defendants' Motion for Summary Judgment on Mr. Odneal's

constitutional claims, it also finds that they did not act with the evil motive or indifference to Mr. Odneal's constitutional rights that is required before punitive damages may be awarded. Therefore, this Court recommends that the Defendants' motion for summary judgment on the question of monetary damages be granted.

## VI.    MR. ODNEAL IS NOT ENTITLED TO INJUNCTIVE RELIEF UNDER THE PRISON LITIGATION REFORM ACT.

Defendants argue that the injunctive relief Mr. Odneal seeks is outside the bounds of what the Prison Litigation Reform Act (PLRA) permits. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C § 3626(a)(1)(A). Courts cannot grant prospective relief unless "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right[,]" and the Courts must give "substantial weight" to the negative effects of such relief on the criminal justice system. *Id.* Because the Court has not found a constitutional violation, it need not speculate on what a narrowly tailored remedy for such a violation would be.

## VII.    MR. ODNEAL'S RENEWED REQUEST FOR COUNSEL IS DENIED.

Mr. Odneal has filed, for the third time, a motion to appoint counsel in this case. (Dkt. No. 80, *see also* Dkt. Nos. 3, 29.) The Court denied his two previous requests without prejudice. (Dkt. No. 10, 30.) This motion raises the same issues as the earlier motions but attaches an inmate trust account statement highlighting that he had a spending balance of

$23.10 in his trust account and nothing in normal savings.[10] (Dkt. No. 81.) This request was filed after summary judgment briefing concluded. The only substantive action an attorney could take at this point in the case is objecting to this Report and Recommendation. Mr. Odneal has articulated his positions well throughout this litigation and the Court is confident he will continue to do so should he object to this Report and Recommendation. Therefore, the Court will deny the Motion at this time. If the Report and Recommendation is not adopted and this case moves to trial, Mr. Odneal may file another motion seeking appointment of counsel.

## ORDER

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's third Motion to Appoint Counsel (Dkt. No. 80) is **DENIED WITHOUT PREJUDICE.**

## RECOMMENDATION

Further, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Dkt. No. 60) be **DENIED**,

2. Defendants' Motion for Summary Judgment (Dkt. No. 63) be **GRANTED**,

3. Plaintiff's complaint be **DISMISSED WITH PREJUDICE.**

Date: May 2, 2024                              *s/ John F. Docherty*
                                               JOHN F. DOCHERTY
                                               United States Magistrate Judge

---

[10] As distinguished from "gate savings." (Dkt. No. 81.) Mr. Odneal has $ 500.00 in "gate savings." (*Id.*)

25

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).